CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

# United States District Court

PM 2: 22
NOV 15

DEPUTY CLERK _____

_____ **NORTHERN** _____ **DISTRICT OF** _____ **TEXAS** _____

In the Matter of the Seizure of

**APPLICATION FOR SEIZURE  WARRANT**

**All funds contained in Account
#XXXXXX4602 in the name of
Criselda Gunselman at PlainsCapital Bank**

**CASE NUMBER:**

# 5 - 11MJ00133

I, ___ **Michael Fiveash, Special Agent, USSS** ___ being duly sworn depose and say:

**I am a(n)** Special Agent with the United States Secret Service **and have reason to believe that in the Northern District of Texas, there is now certain property which is subject to forfeiture to the United States, namely**

**All funds contained in Account #XXXXXX4602 in the name of Criselda Gunselman at PlainsCapital Bank**

which is property subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f) and 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C.  § 2461(c), concerning a violation or violations of 18 U.S.C. § 1343.

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

**See Attached Affidavit**.

Continued on the attached sheet and made a part hereof.      X  Yes      ___ No

**Signature of Affiant**

Sworn to before me, and subscribed in my presence on this the ___15th___ day of November, 2011.

**NANCY M. KOENIG
United States Magistrate Judge**

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT APPLICATIONS

I, Michael J. Fiveash, being duly sworn, depose and state the following:

### Affiant's Background

1.     I am a Special Agent (S/A) with the Department of Homeland Security (DHS), United States Secret Service (USSS), currently assigned to the Lubbock Resident Office.  I have been employed as a federal criminal investigator since January 5, 2009, and have an additional twelve (12) years experience in municipal government.  In my official capacity, I have participated in a variety of investigations ranging from simple, single-party investigations to complex conspiracies.  I have provided instruction to universities, banks, and municipalities regarding financial crimes, identity theft, and related fraud schemes.  In addition to my first-hand law enforcement experience, I have attended DHS/USSS schools where I received training in detecting methods and techniques utilized by individuals to defraud victims using various schemes.  Additionally, I am currently tasked as the Asset Forfeiture Coordinator for the USSS, Lubbock Resident Office.

2.     I have participated in criminal fraud investigations of violations of the laws of the United States on many occasions.  I am familiar with and have participated in all the normal methods of investigation, including, but not limited to, electronic surveillance; visual surveillance; general questioning of witnesses; use of search warrants; use of grand jury subpoenas; use of confidential informants; and also cooperating and coordinating with other federal, state, and local law enforcement

officials.

3.     This Affidavit is being submitted for the purpose of establishing probable

cause for seizure warrants; therefore, it does not include all the facts that I have learned

during the course of this investigation.  Where the contents of conversations of others are

reported herein, they are reported in substance and part.

## Property for Seizure

4.     This Affidavit is made to obtain seizure warrants for the following

property:

> a.     All funds contained in Account #XXXXXX7551[1] in the name of
> Criselda Gunselman at PlainsCapital Bank.
>
> b.     All funds contained in Account #XXXXXX4602 in the name of
> Criselda Gunselman at PlainsCapital Bank.
>
> c.     All funds contained in the account at American Funds Service
> Company in the name of Jeff Gunselman College Fund for Benefit
> of Katherine Earwood, identified by SSN XXX-XX-5431.
>
> d.     All funds contained in the account at American Funds Service
> Company in the name of Jeff Gunselman College Fund for Benefit
> of David Earwood and identified by SSN XXX-XX-5431.
>
> e.     A Shelby Cobra 427 S/C, Shelby Roller, Plate Identification
> CSX4943.

## Legal Authority for Seizure

5.     18 U.S.C. § 981(a)(1)(C) provides for civil forfeiture of property

constituting or derived from the proceeds traceable to any offense, or conspiracy to

---

[1]     To comply with privacy concerns, only the last 4 digits of an account number are listed.

commit an offense, constituting "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7).  Per 18 U.S.C. § 1956(c)(7)(A), specified unlawful activity includes a violation of 18 U.S.C. § 1343 (wire fraud).  Property subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) may be seized by warrant pursuant to 18 U.S.C. § 981(b).

6.      28 U.S.C. § 2461(c) makes criminal forfeiture possible where a criminal law has been violated and civil forfeiture is authorized in connection with the criminal offense.  Property subject to criminal forfeiture may be seized by warrant pursuant to 21 U.S.C. § 853(f).

7.      Further, 18 U.S.C. § 984 provides that, in any forfeiture action *in rem* in which the subject property is funds deposited in an account in a financial institution, the government does not have to identify the funds involved in the offense which is the basis for the forfeiture; it is no defense that those funds have been removed and replaced by other funds; and identical funds found in the same account as the funds involved in the forfeiture offense are subject to forfeiture.  In essence, § 984 allows the government to seize for forfeiture identical property found in the same place where the "guilty" property had been kept.  However, § 984 does not allow the government to reach back in time for an unlimited period; a forfeiture action (including a seizure) against property not directly traceable to the offense which is the basis for the forfeiture cannot be commenced more than one (1) year from the date of the offense.

**Facts Supporting Seizure**

**Introduction**

8.     I am currently investigating alleged criminal violations of the laws of the United States by Absolute Fuels, LLC (AF); AF owner/CEO Jeffrey David Gunselman (Gunselman); other business entities associated with AF; and others known and unknown at this time, for their actions in fraudulently creating and selling credits for renewable fuels that were never produced.  The Lubbock Resident Office of the USSS and the Dallas Office of the Environmental Protection Agency (EPA), Criminal Investigation Division, have jointly been investigating AF and Gunselman since May 2011, for criminal violations of the environmental statues administered by EPA, including the Clean Air Act (42 U.S.C. § 7401 et seq.), and other statutes, specifically 18 U.S.C. § 1343.  Based on the investigation in this case, including information provided by and through a variety of sources, there is probable cause to believe the following:

> a.     From on or about January 2010, to the present, AF, Gunselman, and others known and unknown at this time have fraudulently created and sold credits for renewable fuels that were never produced, thus violating the false statement provision of the Clean Air Act (42 U.S.C. § 7413 (c)(2)(A)), and defrauding the United States, as well as the purchasers of the credits.
>
> b.     From on or about January 2010, to the present, AF, Gunselman, other business entities associated with AF, and others known and

unknown at this time, having devised a scheme or artifice to

defraud, and to obtain money or property by means of false and

fraudulent pretenses, representations, and promises, transmitted and

caused to be transmitted by means of wire communication in

interstate commerce, certain writings and signals for the purpose of

executing such scheme or artifice, in violation of 18 U.S.C. § 1343

and 42 U.S.C. § 7413 (c)(2)(A).

c.     From on or about January 2010, to the present, AF, Gunselman,

other business entities associated with AF, and others known and

unknown at this time, obtained money through the wire fraud

scheme and used it to purchase real and personal property.

**Relevant Environmental Statutes/Background**

9.     The Energy Policy Act of 2005 established a Renewable Fuel Standard

(RFS1), which mandated that a minimum of 4 billion gallons of Renewable Fuels be

used in 2006, and that this minimum usage volume rise to 7.5 billion gallons by 2012.

Two years later, the Energy Independence and Security Act of 2007 established an

expanded Renewable Fuels mandate (RFS2).  RFS2 required the annual use of 9 billion

gallons of Renewable Fuels in 2008, rising to 36 billion gallons annually in 2022.  RFS2

applies to all transportation fuel used in the United States, including diesel fuel intended

for use in highway motor vehicles, non-road, locomotive, and marine diesel.

10.     "Renewable fuels" are fuels produced from feedstocks derived from

biological sources, such as corn-based ethanol and bio-diesel derived from plant oils and animal fats.

11.    The EPA is responsible for implementing regulations to ensure that the national transportation fuel, heating oil, and jet fuel supply sold in the United States during a given year contains the mandated volume of Renewable Fuels.  Under RFS2, producers and importers of gasoline and diesel fuel have a "Renewable Volume Obligation", an amount of Renewable Fuels they are required to blend into non-renewable (fossil) fuel for retail sale per year.  Fuel producers and importers must demonstrate their compliance with RFS2 or incur civil penalties.

12.    EPA established a system of tradable credits for producers of Renewable Fuels, known as Renewable Identification Numbers (RINs).  Each RIN is a unique identifier for a gallon of renewable fuel.  The RIN is used to track volumes of Renewal Fuels.  A RIN is a 38-character alpha-numeric code that is generated by the producer or importer of renewable fuel, representing gallons of renewable fuel produced or imported, and is assigned to batches of renewable fuel that are transferred to others.  The RIN is the basic currency for the RFS program, used by non-renewable fuel producers and importers to demonstrate compliance, and used to track the volumes of renewable fuels from the renewable fuel producer to the producer or importer.

13.    A producer or importer of conventional fuels would purchase renewable fuel, and the associated RINs, from a renewable fuels producer.  The renewable fuel would be blended into conventional fuel for distribution.  The associated RINs are

eventually used by the conventional fuel producer or importer to demonstrate compliance to the EPA, that is, the fulfillment of the "Renewable Volume Obligation."

14.     Since renewable fuels' supply and demand can vary over time and across regions, a market has developed for RINs.  The marketability of RINs allows producers and importers, who have not bought enough bio-fuels, to fulfill their Renewable Volume Obligation by purchasing RINs as a replacement for the actual purchase of renewable fuels.

15.     EPA RFS2 regulations require that RINs may be generated and transferred only though the EPA Moderated Transaction System (EMTS), an Internet-accessible transaction platform used by regulated parties to generate, separate, trade, and retire RINs.  All EMTS activity is conducted through a Central Data Exchange (CDX) account.

16.     RFS2 imposes reporting and record keeping requirements for all producers of Renewable Fuel.  As of July 1, 2010, pursuant to 40 C.F.R. 80.1454, any RIN-generating producer must keep product transfer documents, copies of all reports submitted to EPA, records related to each RIN transaction, and records related to the generation and assignment of RINs, including batch volume, batch number, type and quantity of feedstocks, type and quantity of fuel used for process heat, feedstock energy calculations, and all commercial documents related to details of RIN generation.

### The Absolute Businesses

17.     It was determined from Texas Secretary of State records that AF is a Limited Liability Company registered with the Secretary of State on April 24, 2009.

AF's business address is 2517 74th Street, Lubbock, Texas. Gunselman is named as Governing Person and as Registered Agent.

18.     Based on the investigation in this case, including information provided by and through a variety of sources, it has been determined that, in addition to AF, Gunselman operates multiple business entities. For example, Gunselman formed Absolute Insulation, LLC in August 2008; Absolute Milling, LLC in January 2010; Uneeda Wash, LLC, formed in August 2010, and registered to Gunselman, with the City Bank account listing Alan Lee as the sole proprietorship of the business; however, Gunselman is the CEO with signature authority of Uneeda Wash, LLC; and YGOG Holdings, LLC and Absolute Commercial Realty, LLC in May 2011. Further, in March 2011, Gunselman, as Governing Person and Registered Agent, registered Ellipse Energy, LLC with the Texas Secretary of State; and in September, 2011, he registered Gunner Holdings LLC, and 21 Investments LLC with the Texas Secretary of State. In October, 2011, Gunselman purchased a controlling share of Lubbock Wireless Communications LLC. All these businesses have the business address of 2517 74th Street, Lubbock, Texas.

19.     Based on the investigation in this case, including information provided by and through a variety of sources, it has been determined that the following persons work with AF: President David Powell; Absolute Insulation Account Executive Ty Porter; UNEEDA Wash Account Executive Logan Mclean; Absolute Milling Account Executive Matthew Woodruff; Logistics Officer Brad Rothwell; Plant Manager Johnny

Porras; Director of Philanthropy Jason Jennings; Human Resource Manager Haley Hays; Director of Agriculture Stacy Hardin; EPA Compliance Manager Verna Kell; Chemist Srividya Ayalasomayajula; Absolute Office Manager Taryn Atchley; Marketing Director Ronald Cherry; and UNEEDA Wash Manager Margaret Furr.

20.    Based on the investigation in this case, including information provided by and through a variety of sources, it has been determined that from 2009 to January 2010, AF endeavored to produce bio-diesel through Double Diamond Biofuels, a plant in Dimmit, Texas, owned by Glenn Odom. Gunselman and Odom agreed that AF would supply all raw materials, pay wages for all employees, and pay Odom $0.25 per gallon of bio-diesel produced there. From 2009 to January 2010, Gunselman's Dimmit bio-diesel production showed a loss of approximately $500,000.00. AF produced no bio-diesel at Double Diamond after January 2010.

21.    In February 2010, AF was sued in Cause No. 2010-551142 (99th District Court, Lubbock County, Texas), a suit alleging that AF had failed to pay $189,353.94 owed to Rowena Milling Company for cottonseed oil invoiced in December 2009 and January 2010. The suit stated that AF had entered into a contract with Rowena for the purchase of 1,246,600 pounds of crude cottonseed oil at $0.23 per pound; AF accepted the crude cottonseed oil between November 30, 2009, and December 21, 2009; but subsequently breached the contracted agreement through its failure to pay Rowena the total contract fee. AF defaulted in the suit, and the court granted a judgment in favor of Rowena.

22.     Based on the investigation in this case, including information provided by and through a variety of sources, it has been determined that in August 2010, Gunselman, through Absolute Milling, LLC, purchased Greenlight Bio-Diesel, an existing bio-diesel production facility near Anton, Texas.  Johnny Porras, the AF Manager in charge of producing bio-diesel, made several attempts to produce bio-diesel at Anton, but the attempts to produce bio-diesel fuel were unsuccessful.   Porras had acquired equipment to test bio-diesel samples in the office, and tests of the batch samples of the bio-diesel produced showed that it was not usable.  Porras vented his frustration by stating, "I don't know how to make bio-diesel!"  Before Porras was hired as Manager of AF, he was a diesel mechanic at the Lubbock Peterbilt truck dealer.

23.     Based on the investigation in this case, including information provided by and through a variety of sources, it has been determined that in or about September 2010, Gunselman registered his Anton facility with the EPA.  The facility was approved, and Gunselman was given an EMTS account, giving him authority to generate and sell RINs. In September 2010, AF registered with the EPA's CDX through identification number 3498, in order to conduct online RIN sales pursuant to the regulations set out in 40 C.F.R. 80.1454.  Gunselman conducted all his EMTS activity through a Central Data Exchange (CDX) account.

24.     Based on the investigation in this case, including information provided by and through a variety of sources, the following was determined:

a.     In November 2010, a RINs broker (RINs Broker) was attempting to

buy RINS from Gunselman, and became suspicious when he saw the quantity of RINS that were being sold.  He then challenged Gunselman as to the validity of the RINs.  The RINs Broker asked Gunselman how AF was able to produce the volume of bio-diesel in order to be able to generate such a large quantity of RINs.  The RINs Broker was not satisfied with Gunselman's answers, and cancelled the sale.

b.     In December 2010, the broker sent an e-mail to an EPA employee, stating: "I . . . recently concluded a RIN transaction through EMTS with AF. The RINs appeared to be fine on paper but our vetting process for the RINs uncovered some inconsistencies on the plant and raised doubt on the validity of the RINs."  The EPA Employee subsequently spoke by telephone with the RINs Broker, who said that he believed that the production quantities claimed by AF were not possible with the current economics of the bio-diesel industry. The RINs Broker said he called Absolute's bio-diesel testing lab, and was told the lab only receives sporadic samples of bio-diesel. This did not make sense for a large producer.   AF would not sell the RINs Broker any actual bio-diesel and was selling RINs at about half the market price.

c.     The broker was going to send the questioned RINs back to AF,

because he was not going to pay for them. It appears that he did not

do so; the RINs are still in the Broker's account on the EMTS. The

RINS Broker has not paid for the RINs, and Gunselman has never

complained of non-payment or demanded return of the RINs.

25.     Based on the investigation of this case, including discussion with the

aforementioned EPA employee and review of EPA records, EPA CID S/A Mike Morrow

learned the following:

a.      AF was scheduled for a records audit and inspection to be conducted

by employees of EPA contractor Bionetics Corporation, as required

by EPA. On or about January 10, 2011, Gunselman was informed

by letter of the scheduled EPA inspection and the business records

that were to be produced for review. On February 3 and 4, 2011,

Inspectors conducted a records audit and facility inspection of AF.

On March 7, 2011, an Inspection Report was completed and

forwarded to EPA.

b.      The Inspection Report stated that Inspectors had requested to see

various records required by EPA regulations to be maintained and

provided to EPA upon request. Despite having three weeks advance

notice of the inspection, the Inspectors were not provided the

records and were repeatedly rebuffed by Gunselman, with excuses

such as "need time to assemble" the records, "need additional time

to assemble the records," and "need more time to assemble the

remaining records." The Inspection Report also stated that

Gunselman claimed that he had been extremely busy and was unable

to assemble the requested documentation before the Inspectors

arrived.

c.     The Inspectors presented Gunselman a letter dated February 4, 2011,

requesting the production of records required to complete the audit.

Gunselman agreed to provide requested records by March 18, 2011.

As of the date of this Affidavit, no records had been provided by AF

to EPA.

d.     The Inspection Report noted the Inspectors' observation of "floors

immaculately clean for a bio-diesel production facility." The report

also stated, "It appears that the facility is not producing or producing

less bio-diesel fuel than what was reported to the EMTS."

e.     The Inspection Report stated that during the inspection of the

production facility, Gunselman and Porras told the Inspectors that

the bio-diesel fuel tanks contained "finished diesel product."

However, when the Inspectors asked for bio-diesel fuel samples

from the tanks, they were then told that one tank was being used to

store bio-diesel feedstock (the vegetable oil used in the process) and

that the other tank contained unfinished bio-diesel requiring

additional processing and retesting.

26.    Based on the investigation of this case, including discussion with the EPA employee and review of EPA records, EPA CID S/A Mike Morrow learned the following:

a.    Between January 26, 2010, and April 25, 2011, the AF CDX account was accessed 177 times.  Of the 177 Internet Protocol (IP) addresses from which the Absolute CDX account was accessed, most were from a single IP address in the Lubbock, Texas, geographic area.

b.    The AF CDX account was accessed on October 30, 2010, from an Internet Protocol (IP) address in Wichita, Kansas belonging to Starwood Hotels.

c.    The AF CDX account was accessed December 24, 2010, from an Internet Protocol (IP) address in Alexandria, Virginia; Gunselman's parents reside in Alexandria, Virginia.

d.    The AF CDX account was accessed at 11:21 a.m. on February 24, 2011, from an Internet Protocol (IP) address in San Antonio, Texas.

e.    The EMTS is hosted on a mainframe computer located at Research Triangle Park, Durham, North Carolina.  As previously set forth, all IP addresses from which RIN transactions were conducted on the AF EMTS account were located in the areas of Lubbock, Wichita

(Kansas), San Antonio, and Alexandria (Virginia). Therefore, the transactions were conducted in interstate commerce.

    f.    EMTS data shows that between September 10, 2010, and September 30, 2011, AF sold over 46 million RINs for more than $40,000,000.00. This represents a purported production of over 36 million gallons of bio-diesel.

27.    Based on the investigation of this case, including discussion with a Cooperating Witness (CW-1) who had specific and personal knowledge regarding AF, EPA CID S/A Morrow learned the following:

    a.    AF produced no bio-diesel after January 2010. Attempts to produce bio-diesel at the Anton facility were unsuccessful; samples failed quality tests.

    b.    AF never sold any bio-diesel produced at its Anton facility. AF's Compliance Officer Verna Kell was suspicious of Gunselman's business activity and asked, "Where is all this money coming from?"

    c.    In April or May 2010, Gunselman instructed an employee to sell a specific quantity of RINs; however, the employee declined, because AF had no RINs to sell. Gunselman took the employee out of earshot of the other employees and repeated his instruction to find someone to buy that quantity of RINs, stating, "This is in the pioneering stages and no one will ever know - we'll make the fuel

later."

28.    In or about April 2011, Gunselman purchased a second renewable fuels production facility in Gonzales County, Texas (1130 County Road 239, Gonzales, Texas).  On or about September 2011, Gunselman registered the Gonzalez facility with the EPA.  The facility was approved and assigned a facility number, but no bio-diesel fuel production from this facility has been reported to EPA as of the date of this Affidavit.

## Asset Purchases and RIN Sales by AF and Gunselman

29.    Based on the investigation of this case, including information provided by and through a variety of sources and database queries, Gunselman acquired eleven vehicles, including a 2011 Bentley and a 2011 Cadillac Escalade, and an airplane valued at over $3,000,000.00 while AF was involved in the activities described in the previous paragraphs of this Affidavit (less than two years).  Additionally, according to public records, Gunselman and/or AF or AF-related entities control the following pieces of real property, with almost all purchased in 2010 and 2011:

    a.    The real property at 2517 74th Street, Lubbock, Texas.

        Purchased in July 2010, titled in the name of Absolute Milling LLC, and appraised by LCAD at $240,600.00.

    b.    The real property of UNEEDA Wash LLC, 4403 Clovis Rd, Lubbock, Texas, more specifically, the two lots described by Lubbock Central Appraisal District as Rollins TR A and Blk A Sec 14 AB 861 SW PT OF TR 14 & 15 Mccollum AC: 2.587.

        Purchased in September 2010, titled in the name of Absolute

Milling LLC, and appraised by LCAD at $85,306.00 and $240,600.00, respectively.

c.   The real property at 3819 Idalou Road, Lubbock, Texas.

Purchased in February 2010, titled in the name of Absolute Fuels LLC, and appraised by LCAD at $26,481.00.

d.   The real property at 305 South 1st Street, Slaton, Texas.

Purchased in May 2009, titled in the name of Absolute Insulation LLC, and appraised at $4,500.00 by LCAD.

e.   The real property at 2 East Canyon View Rd, Ransom Canyon, Texas.

Purchased on July 2010, titled in the name of Absolute Milling LLC, and appraised at $9,000.00 by LCAD.

f.   The real property at 3309 101st Street, Lubbock, Texas.

Purchased in September 2011, titled in the name of Absolute Fuels LLC, and appraised by LCAD at $1,159,927.00.

g.   The real property in Lubbock County (zip code 79407) described by LCAD as BLK AK SEC 40 AB 848 SW/4 ACS: 158.332.

Purchased in November 2010, titled in the name of Absolute Milling LLC, and appraised by LCAD at $474,996.00.

h.   The real property in Lubbock County described by LCAD as BLK JS SEC 28 AB 908 S/2 Less SE/C AC: 307.878.

Purchased in September 2010, titled in the name of Absolute Milling LLC, and appraised by LCAD at $189,494.00.

i.   The real property at 1345 FM 168, Nazareth, Texas.

Purchased in October 2010, titled in the name of Absolute Milling LLC, and appraised by Castro Central Appraisal District at $266,830.00.

30.     As described in paragraph 26, AF sold over $40,000,000.00 in RINs in 2010 and 2011, including the following transactions:

a.     In September 2010, AF completed the following CDX sales: 500,000 RINs to Biouria Trading LLC ($0.48 per RIN) for $240,000.00; 500,000 RINs to Biouria Trading LLC ($0.48 per RIN) for $240,000.00; 500,000 RINs to Biouria Trading LLC ($0.48 per RIN) for $240,000.00; 1,000,000 RINs to Musket Corporation ($0.56 per RIN) for $560,000.00; and 1,150,000 RINs to Marathon Petroleum Company ($0.52 per RIN) for $598,000.00.

b.     In October 2010, AF completed the following CDX sales: 1,000,000 RINs to Biouria Trading LLC ($0.27 per RIN) for $270,000; 500,000 RINs to National COOP Refinery Association ($0.56 per RIN) for $280,000.00; 500,000 RINs to Marathon Petroleum Company ($0.55 per RIN) for $275,000.00; 500,000 RINs to Tesoro Corporation ($0.58 per RIN) for $290,000.00; 1,000,000 RINs to Houston Refining LP ($0.58 per RIN) for $580,000.00; 1,000,000 RINs to Sunoco Incorporated ($0.57 per RIN) for $570,000.00; 1,000,000 RINs to Biouria Trading LLC ($0.50 per RIN) for $500,000.00; and 750,000 RINs to Citgo Petroleum Corporation ($0.57 per RIN) for $427,500.00.

c.     On November 4, 2010, AF submitted an online CDX sale for

500,000 RINs to Trafigura AG ($0.56 per RIN).  A Trafigura RINs

broker questioned the legitimacy of the RINs to be sold, asking how

AF could be capable of producing the volume of bio-diesel to

generate such a large quantity of RINs.  The broker was unsatisfied

with Gunselman's answers and cancelled the sale; AF was required

to pay a $50,000.00 cancellation fee.

d.   In November 2010, AF completed the following CDX sales:

500,000 RINs to Sunoco, Inc. ($0.59 per RIN) for $295,000.00;

1,000,000 RINs to Biouria Trading LLC ($0.56 per RIN) for

$560,000.00; 500,000 RINs to Delek Refining LTD ($0.59 per RIN)

for $295,000.00; 500,000 RINs to Houston Refining LP ($0.59 per

RIN) for $295,000.00; 500,000 RINs to PetroDiamond Incorporated

($0.62 per RIN) for $310,000.00; 89,240 RINs to Marathon

Petroleum Company LLC ($0.56 per RIN) for $49,974.40; 500,000

RINs to Kolmar Americas Incorporated ($0.61 per RIN) for

$305,000.00; 500,000 RINs to BP Products, North America ($0.68

per RIN) for $340,000.00; 500,000 RINs to Sunoco Incorporated

($0.60 per RIN) for $300,000.00; and 1,000,000 RINs to Citgo

Petroleum Corporation ($0.59 per RIN) for $590,000.00.

e.   In December 2010, AF completed the following CDX sales:

500,000 RINs to Marathon Petroleum Company LLC ($0.60 per

RIN) for $300,000.00; 500,000 RINs to Sunoco Incorporated ($0.60 per RIN) for $300,000.00; 500,000 RINs to Total Petrochemicals USA Incorporated ($0.80 per RIN) for $400,000.00; 500,000 RINs to Tesoro Corporation ($0.80 per RIN) for $400,000.00; 500,000 RINs to Petrodiamond Incorporated ($0.78 per RIN) for $390,000.00; 500,000 RINs to Tesoro Corporation ($0.70 per RIN) for $350,000.00; 500,000 RINs to Tesoro Corporation ($0.74 per RIN) for $370,000.00; and 500,000 RINs to Tesoro Corporation ($0.65 per RIN) for $325,000.00.

f.   In January 2011, AF completed a CDX sale of 2,000,000 RINs to Tesoro Corporation ($0.60 per RIN) for $1,200,000.00.

g.   In March 2011, AF completed the following CDX sales: 2,000,000 RINs to Petrodiamond Incorporated ($0.50 per RIN) for $1,000,000.00; 1,000,000 RINs to Petrodiamond Incorporated ($0.46 per RIN) for $460,000.00; 1,000,000 RINs to Petrodiamond Incorporated ($0.50 per RIN) for $500,000.00; 1,000,000 RINs to Petrodiamond Incorporated ($0.50 per RIN) for $500,000.00; 2,000,000 RINs to Petrodiamond Incorporated ($0.70 per RIN) for $1,400,000.00; and 192,081 RINs to Marathon Petroleum Company LP ($1.06 per RIN) for $203,605.86.

h.   In April 2011, AF completed the following CDX sales: 500,000

RINs to Marathon Petroleum Company LP ($1.30 per RIN) for $650,000.00; 1,000,000 RINs to Tesoro Corporation ($1.30 per RIN) for $1,300,000.00; 1,000,000 RINs to Marathon Petroleum Company LP ($1.35 per RIN) for $1,350,000.00; and 1,000,000 RINs to Marathon Petroleum Company LP ($1.21 per RIN) for $1,210,000.00.

i.      In May 2011, AF completed the following CDX sales: 1,000,000 RINs to Conoco Phillips ($1.20 per RIN) for $1,200,000.00 and 1,000,000 RINs to Conoco Phillips ($1.30 per RIN) for $1,300,000.00.

j.      In June 2011, AF completed the following CDX sales: 1,000,000 RINs to Citgo Petroleum Corporation ($1.31 per RIN) for $1,310,000.00; 1,000,000 RINs to Tesoro Corporation ($1.36 per RIN) for $1,360,000.00; and 1,000,000 RINs to Citgo Petroleum Corporation ($1.40 per RIN) for $1,400,000.00.

k.      In July 2011, AF completed the following CDX sales: 1,125,000 RINs to G.P.&W., Inc. DBA Center Oil Company ($1.33 per RIN) for $1,496,250.00 and 1,000,000 RINs to G.P.&W., Inc. DBA Center Oil Company ($1.32 per RIN) for $1,320,000.00.00.

l.      In August 2011, AF completed a CDX sale of 1,000,000 RINs to Citgo Petroleum Corporation ($1.34 per RIN) for $1,340,000.00.

## Search Warrants

31.     On October 17, 2011, EPA and USSS agents executed federal search

warrants at Gunselman's Toledo Avenue residence, the AF offices (101st Street and 74th

Street, respectively), and the AF Anton facility.  Additionally, USSS agents seized the

eleven vehicles and the airplane mentioned in paragraph 29.  As a result of documents

and materials found in the seizures and searches, and additional records obtained in the

course of the investigation, and consensual interviews with AF employees and

contractors on October 17, 2011, the agents determined the following:

   a.     AF had never produced useable, marketable bio-diesel.

   b.     Gunselman purchased a Shelby Cobra 427 S/C completed in May

          2010 for $129,999.00.  The vehicle is currently in the San Antonio

          area in possession of professional athlete Tony Parker.  The vehicle

          is described as bearing the Plate Identification CSX4943.

   c.     Gunselman recently purchased the residence at 11411 Cat Springs,

          Boerne, Texas for $2,650,000.00 from another professional athlete,

          putting down $2,000,000.00 as a down payment.

   d.     Gunselman traveled to Europe in 2011.  On that trip, he traveled to

          Geneva, Switzerland to establish a financial account in that country.

   e.     Gunselman maintained the following accounts at UBS Financial

          Services:

          Account #XXX9988 in the name of Jeff Gunselman College Fund

for Benefit of Katherine Earwood at UBS Financial Services, with an approximate balance of $70,000.00, as of October 18, 2011.

Account #XXX0002 in the name of Jeff Gunselman College Fund for Benefit of David Earwood at UBS Financial Services, with an approximate balance of $70,000.00, as of October 18, 2011.

f.    The Accounts described in paragraph **e.**, were maintained at UBS

Financial, 1200 Harbor Boulevard, Weehawken, NJ.  Subsequent

information received as a result of the continuing investigation,

revealed that these accounts are held by UBS as a transfer agent for

American Funds Service Company.  The Account identified as UBS

Account #XXX0002, Jeff Gunselman College Fund for Benefit of

David Earwood, and the Account identified as UBS Account

#XXX9988, Jeff Gunselman College Fund for Benefit of Katherine

Earwood, are held by American Funds Service Company, as a

Broker Dealer Firm, 6455 Irvine Center Dr, Irvine, California.

g.    On October 17, 2011, agents found $23,419.00 in cash inside

Gunselman's Mercedes parked at his Toledo Avenue residence.

Additionally, receipts from European hotels and retailers; luxury

jewelry, including Rolex and Bulova watches; luxury purses and

scarves; and a 55-inch Samsung LED 3D TV were found inside his

house.

h.    Records recovered from the Toledo Avenue house indicate that

**Affidavit in Support of Seizure Warrant Applications - Page 23**

Criselda Gunselman, Gunselman's wife, received a bi-weekly

paycheck in the approximate amount of $3,500.00 from AF, which

she deposited into the PlainsCapital Bank Checking Account.

Criselda Gunselman subsequently gave a consensual interview.

Criselda Gunselman identified herself as an Account Executive for

AF, but stated that she had visited the AF office only once. She

further stated that her duties include residential chores and managing

her husband's dry cleaning. Criselda Gunselman was unable to

describe any direct professional responsibilities related to Absolute

Fuels LLC. According to Texas Workforce Commission records,

she was paid $99,000.00 in wages in the 4th quarter of 2010.

i.  According to bank records, AF and/or Gunselman (in name or as

signatory) maintains the following local financial accounts, as of

October 17, 2011:

**City Bank**, 5219 City Bank Parkway, Lubbock, Texas -

| Name | Account # | Balance | Class | Type |
|------|-----------|---------|-------|------|
| Jeff Gunselman | xxxx9753 | $ 173,866.01 | Personal | Reward |
| Jeff Gunselman/ Absolute Milling | xxxx4958 | $ 1,500.00 | Personal & LLC | P&E Checking |
| Alan Lee/ Gunselman | xxxx6357 | $ 8,599.15 | Personal | Small Business |
| Jeff Gunselman/ Absolute Insulation | xxxx0365 | $ 4,689.74 | Personal & LLC | Small Business |
| Absolute Milling | xxxx5154 | $ 78,263.11 | LLC | RFSWP #3 |

**Aim Bank**, Lubbock, Texas -

| Name | Account # | Balance | Class | Type |
|---|---|---|---|---|
| Absolute Fuels | XX3134 | $ 2,001.33 | Personal & LCC | Checking |
| Absolute Commercial | XX7747 | $ 65,550.00 | Personal & LLC | Checking |
| Lubbock Wireless Communications | XX7941 | $ 1,314.97 | Personal & LLC | Checking |
| Ellipse Energy | XX8921 | $ 48,871.34 | Personal & LLC | Checking |
| Absolute Milling | XX9391 | $ 25,058.95 | Personal & LLC | Checking |
| Ellipse Energy | XX7886 | $ 30,144.90 | Personal & LLC | CD |
| Absolute Fuels | XX7916 | $ 50,241.50 | Personal & LLC | CD |
| Absolute Fuels | XX2816 | $ 193,667.52 | Personal & LLC | Savings |
| YGOG Holdings/ Jeff Gunselman | XX7712 | $ 11,027.00 | Personal | Checking |

Based on AIM Bank records, the AF account XX3134 directly received the proceeds from Gunselman's RIN sales. For example, the records showed a deposit of the payment for the 1,000,000 RIN sold to Citgo in August 2011 for $1,340,000.00, as previously detailed in paragraph 30(l). Seizure warrants were obtained on October 17, 2011, for the funds in the fourteen local accounts. As

indicated in the tables, the total funds in those fourteen accounts was well below the approximately $40,000,000.00 received by Gunselman through the RIN fraud scheme, indicating that a large portion of the forfeitable property has already been taken and spent from these accounts.

32.     Records obtained from PlainsCapital Bank relating to bank accounts held in the name of Criselda Gunselman revealed that a bi-weekly net direct deposit of $3,548.60 was made from AF to the PlainsCapital Bank Checking Account #XXXXXX7551.  This direct deposit is described on banking statements as being paid by "ABSOLUTE FU-DIRDEP".  Additionally, reoccurring and regular electronic transfers were made from PlainsCapital Bank, Checking Account #XXXXXX7551, to the PlainsCapital Bank, Savings Account #XXXX4602.

33.     Additionally, based on the investigation in this case, including information provided by and through a variety of sources, specifically information provided by an individual identified in this investigation as Jeff Gunselman's girlfriend, Affiant determined the following:

a.      Jeff Gunselman routinely took expensive trips and vacations where he would explore the purchase of real estate and various business partnerships, including a brokerage firm, in the San Antonio, Texas, area.

b.      Gunselman enjoyed a close relationship with professional athlete

Tony Parker for whom he purchased the Shelby Cobra automobile.

c.   Gunselman purchased the residence at 11411 Cat Springs, Boerne, Texas, which Gunselman furnished through purchases from Louis Shanks furniture store, in San Antonio, Texas.

34.   Based on the investigation in this case, including information provided by and through a variety of sources, Gunselman has no other source of income but the AF business and its associated entities.   Based upon the interviews of AF employees, the only AF-related business that "breaks even" is the Uneeda Wash, LLC business; there are no profitable AF-related businesses/entities.

## Conclusion

35.   Based on the information in the preceding paragraphs of this Affidavit and my training and experience, I believe there is probable cause that the property described in paragraph 4 of this Affidavit is subject to civil and criminal forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) as property derived from proceeds traceable to violations of 18 U.S.C. § 1343.

36.   Based on my training and experience, a protective order under 21 U.S.C. § 853(e) will not be sufficient to assure the availability of the non-account property due to its inherent mobility and "saleability."   These items of property could easily be hidden/concealed or removed from the United States to a neighboring country such as Canada or Mexico, and thus made unavailable for forfeiture.   Additionally, they could quickly be sold to an unsuspecting buyer or used as collateral for funds with

unsuspecting lenders. Further, based on my training and experience, a protective (restraining) under 21 U.S.C. § 853(e) will not be sufficient to assure the availability of the account funds. Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. Moreover, based on my contact with the financial institutions involved with the accounts listed in paragraph 4, the total of the current balances in those accounts is well below the $40,000,000.00 received through the RIN sales scheme, indicating that a large portion of the forfeitable property has already been taken from those accounts. For these reasons, I believe that an order under 21 U.S.C. § 853(e) will not be sufficient to assure the property's availability for forfeiture.

37.    I, therefore, request that seizure warrants be issued for the property described in paragraph 4 of this Affidavit, pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f).

MICHAEL J. FIVEASH
Special Agent, United States Secret Service

**Affidavit in Support of Seizure Warrant Applications - Page 29**

Reviewed and Approved:

SARAH R. SALDAÑA
UNITED STATES ATTORNEY

PAULINA M. JACOBO
Assistant United States Attorney

Subscribed to and sworn to before me this 15th day of November, 2011.

NANCY M. KOENIG
UNITED STATES MAGISTRATE JUDGE
Northern District of Texas at Lubbock

**Affidavit in Support of Seizure Warrant Applications - Page 30**